UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
NORTHERN DIVISION

| | | |
|---|---|---|
| MARVIN L. MILLER, and<br>BRIAN M. TILLER | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civ. No.: _____ |
| v. | ) | Judge: _____ |
| | ) | |
| CITY OF LAFOLLETTE, TENNESSEE, | ) | |
| LAFOLLETTE CITY COUNCIL, and | ) | **JURY DEMAND** |
| STAN FOUST, in his individual and official | ) | |
| capacity, City Administrator and | ) | |
| Public Records Coordinator, | ) | |
| | ) | |
| Defendants. | ) | |

---

## COMPLAINT

---

COMES NOW, the Plaintiffs, MARVIN L. MILLER and BRIAN M. TILLER, by and through counsel, hereby file this Complaint for violations of the United States Constitution and Tennessee common and statutory law against the Defendants, CITY OF LAFOLLETTE, TENNESSEE, LAFOLLETTE CITY COUNCIL, and STAN FOUST, City Administrator and Public Records Coordinator, and for cause of action would show unto the Honorable Court as follows:

## PARTIES

1.      Plaintiff, Marvin L. Miller ("Miller") is and was, at all times relevant herein, a resident of Campbell County, Tennessee.

2.      Plaintiff, Brian M. Tiller ("Tiller") is and was, at all times relevant herein, a resident of Campbell County, Tennessee.

3.      Defendant, City of LaFollette, Tennessee ("City of LaFollette"), is the principal

city in Campbell County, Tennessee.

4.      Defendant City of LaFollette is governed and ruled by Defendant, LaFollette City Council and its members.

5.      Defendant LaFollette City Council is the governing body for the City of LaFollette and consists of the mayor and 4 city council members, all of whom are elected officials.

6.      Defendant LaFollette City Council is vested with the joint authority to authorize the discipline and termination of employees.

7.      Defendant Stan Foust ("Defendant Foust") was employed as the City Administrator for the Defendant City of LaFollette, at most relevant times of this Complaint, and he was charged with supervising and enforcing the rules and procedures of the City of LaFollette Police Department, as well as the policies of the City of Lafollette, and is vested with the joint authority to discipline and terminate employees. He is also charged with maintaining, preserving, and providing city records to the public as the Public Records Coordinator. Based upon information and belief, Stan Foust is a resident of Campbell County, Tennessee.

## JURISDICTION AND VENUE

8.      This action is brought to redress alleged deprivations of constitutional rights as protected by 42 U.S.C. § 1983 and the First and Fourteenth Amendments of the United States Constitution. Original jurisdiction is founded in 28 U.S.C. §§ 1331 and 1343.

9.      Pursuant to 28 U.S.C. § 1367(a), the Court also has supplemental jurisdiction over all claims brought under Tennessee law.

10.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1).

11.     At all times material hereto, Defendants were subject to the provisions of 42 U.S.C. § 1983.

12.     At all times material hereto, Defendant City of LaFollette was an employer subject to the provisions of the Tennessee Public Protection Act, Tenn. Code Ann. § 50-1-304.

13.     At all times material hereto, Defendant City of LaFollette was a "public employer" within the meaning of the Tennessee Public Employee Political Freedom Act, Tenn. Code Ann. § 8-50-601, *et seq*.

14.     At all times material hereto, the members of Defendant LaFollette City Council were public officials under Tennessee law and elected by the citizens of Campbell County, Tennessee.

15.     At all times material hereto, the members of Defendant LaFollette City Council were each an "elected public official" within the meaning of the Tennessee Public Employee Political Freedom Act, Tenn. Code Ann. § 8-50-601, *et seq*.

16.     At all times material hereto, the Plaintiffs were each a "public employee" within the meaning of the Tennessee Public Employee Political Freedom Act, Tenn. Code Ann. § 8-50-601, *et seq*.

17.     At all times material hereto, Defendant City of LaFollette was an employer engaging in an industry affecting commerce and employed more than one hundred (100) employees in the State of Tennessee.

18.     At all times material hereto, Defendant LaFollette City Council had final policy-making authority over Defendant City of LaFollette.

19.     At all times material hereto, William "Bill" Roehl (up to his retirement), Stephen Wallen, Charles Duff, and Defendant Foust were employees of the City of LaFollette, Tennessee.

20.     At all times material hereto, Defendants, its agents and employees, were each a "public servant" within the meaning of the Tennessee statute for Misconduct Involving Public

Officials and Employees, Tenn. Code Ann. § 39-16-401, *et seq*.

21.     As set forth herein, during their employment, the Plaintiffs engaged in and intended to continue to engage in constitutionally and legally protected activity by speaking or engaging in speech activity on matters of great public concern and by reporting, opposing, and refusing to remain silent about or participate in the illegal activities of agents and/or employees of Defendants in violation of Tennessee law, including, but not limited to, the following statutes, among other laws, regulations, and ordinances, to-wit:

- Electronic Tracking of Motor Vehicles, Tenn. Code Ann. § 39-13-606.

- Freedom from Unwarranted Surveillance Act, Tenn. Code Ann. § 39-13-609.

- Official Misconduct, Tenn. Code Ann. § 39-16-402.

- Official Oppression, Tenn. Code Ann. § 39-16-403.

- Tampering with or Fabricating Evidence, Tenn. Code Ann. § 39-16-503.

- Destruction of and Tampering with Governmental Records, Tenn. Code Ann. § 39-16-504.

22.     The Tennessee statutes set forth in Paragraph 21 are intended to protect the public health, safety, and welfare.

23.     The Tennessee statutes set forth in Paragraph 21 reflect clear and unambiguous statements of public policy.

24.     The Tennessee statutes set forth in Paragraph 21 can subject the Defendants, its agents and/or employees to civil and/or criminal penalties and fines.

25.     Conduct in violation of the Tennessee statutes set forth in Paragraph 21 are matters of public concern.

26.     Conduct in violation of the Tennessee statutes set forth in Paragraph 21 constitute

"illegal activities" as defined in Tenn. Code Ann. § 50-1-304.

## FACTUAL ALLEGATIONS

27.     Prior to their terminations on August 2, 2022, Plaintiff Tiller served as Lieutenant and Plaintiff Miller served as Sergeant for the LaFollette Police Department ("the Department").

28.     Plaintiff Tiller was originally hired by the Defendant City of LaFollette in 1996 as a Senior Patrol Supervisor, and he voluntarily resigned in 2002, and he was thereafter rehired in 2010.

29.     In 2016, Plaintiff Tiller was promoted to Lieutenant, and he remained in this position up until his termination, as hereinafter alleged.

30.     At all times material hereto, Plaintiff Tiller was qualified for the position of Lieutenant.

31.     During his employment, Plaintiff Tiller earned numerous promotions and merit raises.

32.     During his employment, Plaintiff Tiller received numerous positive evaluations and commendations.

33.     During his employment, Plaintiff Tiller performed his duties in a competent and satisfactory manner.

34.     During his employment, Plaintiff Tiller was never written-up for any disciplinary reason, other than when he wrote himself up for missing a court date and when he made a clerical mistake while conducting a background check.

35.     Plaintiff Miller was the second-longest serving member of the Department, having faithfully served the LaFollette community for twenty-seven (27) years under various leadership regimes.

36.     Plaintiff Miller was originally hired by Defendant City of LaFollette in 1996 as a part-time patrol office. He moved to full-time patrol officer in 1998 and was subsequently promoted to Sergeant in 2004.

37.     At all times material hereto, Plaintiff Miller was qualified for the position of Sergeant.

38.     During his employment, Plaintiff Miller earned numerous promotions and merit raises.

39.     During his employment, Plaintiff Miller received numerous positive evaluations and commendations.

40.     During his employment, Plaintiff Miller performed his duties in a competent and satisfactory manner.

41.     William "Bill" Roehl was employed as the Chief of Police of the City of LaFollette Police Department, at most relevant times of this Complaint, until he retired as Chief of Police on September 1, 2022.

42.     As Chief of Police, Bill Roehl, was charged with supervising and enforcing the rules and procedures of the City of LaFollette Police Department, as well as the policies of the City of Lafollette, and he was also charged with enforcing progressive discipline against employees, as needed.

43.     Stephen Wallen was employed as a Captain of the City of LaFollette Police Department, at most relevant times of this Complaint, and he was promoted to Chief of Police on August 2, 2022, upon Chief Bill Roehl's retirement.

44.     As Captain of the Police Department, Stephen Wallen was charged with supervising and enforcing the rules and procedures of the City of LaFollette Police Department,

as well as the policies of the City of Lafollette, and he was also charged with enforcing progressive discipline against employees, as needed.

45.     Charles Duff was employed as a Staff Sergeant of the City of LaFollette Police Department, at most relevant times of this Complaint, and was promoted to Captain on October 4, 2022, shortly after Stephen Wallen was promoted to Chief of Police.

46.     As Staff Sergeant, Charles Duff was charged with supervising and enforcing the rules and procedures of the City of LaFollette Police Department, as well as the policies of the City of Lafollette, and he was also charged with enforcing progressive discipline for employees, as needed, including for his subordinates such as Plaintiff Miller.

47.     At all times material hereto, the Defendant City of LaFollette's Personnel Policy, under Section K – Dismissal, mandates that a full-time employee terminated for "just cause" must be "furnished an advance written notice containing the nature of the proposed action, the reasons therefore, and the right to appeal the charges orally or in writing before the City Administrator." (City of LaFollette's Personnel Policy under Section K – Dismissal, attached hereto as Exhibit 1).

48.     At the time of Plaintiffs' terminations, Section K – Dismissal of the Defendant City of LaFollette's Personnel Policy was in full force and effect. (*See* Exh. 1).

49.     By way of background, during the Defendant City of LaFollette's elections in November 2020, a citizen of the City, Mike Evans, ran for a seat on the Defendant LaFollette City Council, and, leading up to the elections, Plaintiff Tiller engaged in numerous protected activities by openly supporting Evans' candidacy for City Council, such as discussing his support for Evans directly with other City Council members, including Councilman, Mark Hoskins, and campaigning at Evans' tent on Election Day in November 2020, while off-duty, where Plaintiff Tiller was seen by several of the other Defendants and/or agents and employees thereof.

50.     Ultimately, Mike Evans did not win, and, instead, Phillip Farmer and Wayne Kitts were elected to the Defendant LaFollette City Council in November 2020.

51.     Beginning in March 2022, forward, Mike Evans announced his intent to again run in the upcoming elections for the Defendant LaFollette City Council in November 2022, at which time it was anticipated that Evans would be running against the incumbents, Councilwoman, Stephanie Solomon, and Councilman, Bryan St. John.

52.     Thereafter, throughout the 2022 timeframe, Plaintiff Tiller continued to express his support for Mike Evans in the upcoming City Council elections in November 2022, including but not limited to, directly supporting him during conversations with other City Council members, including Bryan St. John and Mark Hoskins, and expressing his opinion that Evans would make a good City Council member if elected in the upcoming elections.

53.     During this timeframe throughout 2022, it was discussed and well-known within the Defendant City of LaFollette, particularly within the Police Department, that if certain candidates were elected in the upcoming November 2022 elections for City Council and Mayor, then Plaintiff Tiller would be made Chief of Police upon the anticipated retirement of Bill Roehl.

54.     During this timeframe throughout 2022, it was also discussed and well-known within Defendant City of LaFollette, particularly within the Police Department, that Plaintiff Miller supported Plaintiff Tiller to become the next Chief of Police.

55.     During this timeframe throughout 2022, it was also discussed and well-known within Defendant City of LaFollette, particularly within the Police Department, that Plaintiff Miller and Plaintiff Tiller believed Joe Bollinger, if elected as Mayor, would help Plaintiff Tiller become the next Chief of Police.

56.     During this timeframe throughout 2022, it was also discussed and well-known

within Defendant City of LaFollette, particularly within the Police Department, that Stephen Wallen did not support Mike Evans' candidacy for Defendant LaFollette City Council in the upcoming November 2022 elections.

57.     Instead, Stephen Wallen made it clear that he supported the LaFollette City Council incumbents, Stephanie Solomon and Bryan St. John, who were anticipated to be running against challengers, like Mike Evans, in the upcoming November 2022 elections for City Council.

58.     Further, during this timeframe throughout 2022, it was also discussed and well-known within Defendant City of LaFollette, particularly within the Police Department, that members of Defendant LaFollette City Council, Stephanie Solomon and Bryan St. John, were allies of Stephen Wallen.

59.     In fact, in or around May or June 2022, Stephen Wallen explicitly told LaFollette City Councilwoman, Stephanie Solomon, that Wallen "needed" her to get reelected for City Council in the upcoming November 2022 elections in order to "support" him to become the next Chief of Police.

60.     Stephen Wallen needed the "support" of his allies on Defendant LaFollette City Council, including Stephanie Solomon and Bryan St. John, in order to ensure that he was selected as the next Chief of Police, upon the retirement of Bill Roehl, and also to ensure that Wallen could influence their votes in such ways that benefited him personally and professionally, such as by voting on personnel decisions, including the terminations of Plaintiffs in August 2022, as hereinafter alleged.

61.     Therefore, throughout the 2021 and 2022 timeframe, Stephen Wallen and others actively campaigned in support of the incumbents, Stephanie Solomon and Bryan St. John, for their reelections in the upcoming November 2022 elections for City Council, while also negatively

campaigning against those running against his allies on City Council, including Mike Evans.

62.     For example, on July 9, 2022, while at the 125th City of LaFollette Celebration, Stephen Wallen's wife, Cheryl Wallen, with the knowledge of Stephen Wallen, wore a shirt that stated: "A vote for Mike Evans is a vote for Brian Tiller. Let's not go through that again." (True and accurate photograph of Cheryl Wallen's shirt, attached hereto as Exhibit 2).

63.     On information and belief, Stephen Wallen and/or his wife had the shirt (at Exh. 2) specially made by customer order.

64.     In or around that time, Stephen Wallen and/or his wife also sent a picture of this shirt to agents and/or employees of the Defendants. (*See* Exh. 2).

65.     Defendants, their agents and/or employees witnessed Stephen Wallen's wife wearing the shirt campaigning against Mike Evans and Plaintiff Tiller (at Exh. 2) at the 125th City of LaFollette Celebration on July 9, 2022, including, but not limited to, LaFollette City Councilman Mark Hoskins, Police Officers Melissa Myers and Mike Satkowski, among others, as well as the general public.

66.     On July 11, 2022, Plaintiff Tiller reported to the attorney, Celeste Herbert, who had been hired by Defendant City of LaFollette to conduct an investigation, as hereinafter alleged, that Stephen Wallen's wife, Cheryl Wallen, was wearing the shirt (at Exh. 2).

67.     Later that day, on July 11, 2022, the attorney, Celeste Herbert, emailed Defendant Foust to ask if he saw Stephen Wallen's wife wearing the shirt (Exh. 2) at the 125th City of LaFollette Celebration, and Herbert further remarked: "If that is true, Wallen is really stirring the pot." (Celeste Herbert's Email to Foust, dated July 11, 2022, attached hereto as Exhibit 3).

68.     The following day, July 12, 2022, the attorney, Celeste Herbert, emailed Defendant Foust to ask if he had "any reason to be coming to Knoxville in the next week" and Herbert further

stated: "I would like for us to meet and I would rather meet here than in your office." (Celeste Herbert's Email to Foust, dated July 12, 2022, attached hereto as Exhibit 4).

69.     Prior to Plaintiffs' terminations, as hereinafter alleged, Defendant Foust was aware of and/or had knowledge that both Plaintiffs supported Mike Evans' candidacy in the upcoming November 2022 City Council elections.

70.     Prior to Plaintiffs' terminations, as hereinafter alleged, Bill Roehl was aware of and/or had knowledge that both Plaintiffs supported Mike Evans' candidacy in the upcoming November 2022 City Council elections.

71.     Prior to Plaintiffs' terminations, as hereinafter alleged, Stephen Wallen was aware of and/or had knowledge that both Plaintiffs supported Mike Evans' candidacy in the upcoming November 2022 City Council elections.

72.     Prior to Plaintiffs' terminations, as hereinafter alleged, Charles Duff was aware of and/or had knowledge that both Plaintiffs supported Mike Evans' candidacy in the upcoming November 2022 City Council elections.

73.     Prior to Plaintiffs' terminations, as hereinafter alleged, City Councilman, Mark Hoskins, was aware of and/or had knowledge that both Plaintiffs supported Mike Evans' candidacy in the upcoming November 2022 City Council elections.

74.     Prior to Plaintiffs' terminations, as hereinafter alleged, City Councilman, Wayne Kitts, was aware of and/or had knowledge that both Plaintiffs supported Mike Evans' candidacy in the upcoming November 2022 City Council elections.

75.     Prior to Plaintiffs' terminations, as hereinafter alleged, City Councilwoman, Stephanie Solomon, was aware of and/or had knowledge that both Plaintiffs supported Mike Evans' candidacy in the upcoming November 2022 City Council elections.

76.     Prior to Plaintiffs' terminations, as hereinafter alleged, City Councilman, Bryan St. John, was aware of and/or had knowledge that both Plaintiffs supported Mike Evans' candidacy in the upcoming November 2022 City Council elections.

77.     In 2019, one of Plaintiff Tiller's subordinates reported to Plaintiff Tiller that he discovered Stephen Wallen had fixed a speeding ticket for a female friend—by ensuring the female friend's speeding ticket was removed before it was processed into the judicial system—but the subordinate did not feel comfortable reporting this to the Chief of Police, so Plaintiff Tiller instructed the subordinate to report it to the City Administrator at that time, Jimmy Jeffries.

78.     Shortly thereafter, in early 2020, Plaintiff Tiller discussed his concern about the ticket fixing complaint with the City Administrator, Jimmy Jeffries, and Plaintiff Tiller was informed that Jeffries reported Stephen Wallen's ticket fixing for the female friend to the appropriate authorities within Defendant City of LaFollette's government, the District Attorney, but no action was taken to investigate the report at that time.

79.     In May and June 2022, Plaintiff Tiller discussed with Defendant LaFollette City Council members, including Bryan St. John and Mark Hoskins, his complaint that Stephen Wallen had previously fixed a speeding ticket for a female friend in 2019, and that this had previously been reported to the prior City Administrator, Jimmy Jeffries, to which Hoskins stated in response that he now "had to report" that Wallen had fixed the ticket.

80.     On June 8, 2022, Stephen Wallen was suspended without pay pending an investigation into potential misconduct for his removal of a speeding ticket that was issued to a female citizen on June 17, 2019, before the ticket could be filed into permanent recordkeeping and processed into the judicial system, so she would not be charged (*i.e.*, "ticket fixing"). (Wallen Notice of Suspension, dated June 8, 2022, attached hereto as Exhibit 5).

81.     In fact, a news article that was subsequently published on July 29, 2022, quoted Stephen Wallen as describing the female citizen, referenced above, as someone he had "known from childhood."

82.     Effectively, the prior reports of Stephen Wallen fixing the ticket for the female citizen in 2019 and 2020 were swept under the rug and ignored by the authorities within the Defendant City of LaFollette.

83.     At all times material hereto, it would be illegal under Tennessee law for police officers to exceed the officer's official power and authority by removing a citation, or other evidence, as a favor for a friend before it is processed into the judicial system.

84.      At all times material hereto, it would be illegal under Tennessee law for police officers to use their official position, power and authority to give special treatment to certain private citizens, such as by helping a friend avoid a speeding ticket by removing it before it is filed into the permanent records of the judicial system.

85.     At all times material hereto, police officers exceeding their official power and authority by removing a citation, or other evidence, for a friend before it can be processed into the judicial system is a grave matter of public concern.

86.     At all times material hereto, police officers abusing the authority of their positions is a matter of public concern that involves wrongdoing and the breach of public trust.

87.     At all times material hereto, the ticket fixing as described above is illegal.

88.     Shortly after Plaintiff Tiller's reports of Stephen Wallen fixing the ticket for the female citizen resurfaced in the May and June 2022 timeframe, the Campbell County District Attorney General, Jared Effler, requested for the Tennessee Bureau of Investigation ("TBI") to conduct an investigation into Stephen Wallen.

89.     During the ensuing investigation, Stephen Wallen admitted to removing the female citizen's speeding citation from the area of the Police Department where citations were filed before being entered into permanent records of the judicial system and brought before the City Judge of Lafollette.

90.     On or about June 11, 2022, during Stephen Wallen's suspension pending the investigation, Plaintiff Tiller complained to the City Administrator, Defendant Foust, that during a recent funeral procession for a Four-Star General in the LaFollette community, as Tiller was on-the-job directing the traffic, Wallen extended his middle finger at Tiller while driving by in the procession for the public to see, even though Wallen was suspended at that time.

91.     However, Defendant Foust was dismissive of this complaint, and was more concerned that Stephen Wallen was suspended and how this caused bad publicity for Defendant City of LaFollette.

92.     In fact, during this conversation between Plaintiff Tiller and Defendant Foust on or about June 11, 2022, Foust became upset and angry about the TBI's investigation into Stephen Wallen, and Foust stated, "Whoever turned Steve [Wallen] into the TBI has made a 'black eye' on the City," and Foust further stated in a threatening tone that the TBI was going to "investigate everything, even you," although Foust would not elaborate as to why Tiller would also be investigated. During this conversation, Foust was very concerned about who reported Wallen, and even remarked that "when the TBI determines who made this report, they will stand before the [City] Council and this Council will not tolerate this kind of bad publicity against the City." Foust's tone was threatening and otherwise accusatory as he further remarked that he "hoped whoever did this can sleep well at night" and that "one of you is going to be fired," all of which was in clear reference to the Plaintiffs.

93.     During Stephen Wallen's suspension and the TBI's investigation, Wallen told multiple employees and agents of the Defendants, City of LaFollette and City Council, that he blamed the Plaintiffs for causing his ticket fixing to be reported to the TBI resulting in his suspension and the TBI investigation, and that Wallen was going to get Plaintiffs fired for it.

94.     Shortly after Stephen Wallen was suspended pending the TBI's investigation, on June 13, 2022, Charles Duff filed with the Defendants, City of LaFollette, City Council, and Foust, as well as others, a retaliatory grievance against both of the Plaintiffs because Duff—like Wallen and Foust, among others—also blamed Plaintiffs for reporting Wallen's ticket fixing that resulted in the TBI's investigation and Wallen's suspension.

95.     Charles Duff's grievance dated June 13, 2022, was filed with Defendants at the direction and/or knowledge of Stephen Wallen.

96.     Stephen Wallen reviewed Charles Duff's grievance before it was filed with Defendants on June 13, 2022.

97.     Stephen Wallen provided input and/or suggested changes to Charles Duff's grievance before it was filed with Defendants on June 13, 2022.

98.     Charles Duff's grievance, dated June 13, 2022, among other things, accused Plaintiffs of doing "nothing but stir drama with fabricated stories and lies."

99.     Charles Duff's grievance, dated June 13, 2022, among other things, accused Plaintiff Miller of "waiting for political gain" by not immediately reporting Stephen Wallen for fixing the ticket for the female citizen in 2019.

100.    Charles Duff's grievance, dated June 13, 2022, among other things, accused Plaintiffs of attempting to "stack the election" with respect to the upcoming November 2022 elections for City Council and Mayor.

101.    Charles Duff's grievance, dated June 13, 2022, among other things, accused Plaintiffs, Miller and Tiller of trying to disrupt and divide the workplace.

102.    Charles Duff's grievance, dated June 13, 2022, among other things, accused Plaintiff Miller of having intentions to get Duff terminated.

103.    Charles Duff's grievance, dated June 13, 2022, among other things, accused Plaintiff Miller of being an alcoholic.

104.    Charles Duff's grievance, dated June 13, 2022, among other things, further asserted that Plaintiff Tiller "spends hours at a time outside the city during his shift just sitting getting paid by the city and sitting in the county for hours. I have proof. Also going to Mike Evans house for hours almost every shift he works, I have proof."

105.    Charles Duff's "proof" that he claimed to have, as referenced in his grievance of June 13, 2022, pertains to the fact that Duff was one of the Defendants' employees involved in tracking Plaintiff Tiller's real time location via a GPS tracking device and/or surveillance drone, as hereinafter alleged.

106.    Charles Duff's grievance, dated June 13, 2022, also expressed concerns about the members of Defendant LaFollette City Council changing after the upcoming November 2022 elections, including "what will happen if the council does change and [Plaintiff] Tiller goes in as Chief…."

107.    Prior to Plaintiffs' terminations, as hereinafter alleged, each member of Defendant LaFollette City Council reviewed a copy of Charles Duff's grievance dated June 13, 2022.

108.    The Defendants decided to retain an outside attorney, Celeste Herbert, out of Knoxville, TN, to conduct an investigation into Charles Duff's grievance dated June 13, 2022.

109.    Charles Duff's grievance was initiated by Duff and Stephen Wallen, among others,

to retaliate against the Plaintiffs for their support of other political candidates as well as due to their belief that Plaintiffs had reported the ticket fixing incident and caused Wallen's suspension.

110.    In the meantime, on June 24, 2022, as the TBI's investigation into Stephen Wallen's reported misconduct—which he admitted to—concluded, Campbell County District Attorney General, Jared Effler, sent a letter to an Agent of the TBI which stated, in relevant part, Effler's determination that Stephen Wallen "committed no criminal act" and "request this case be closed."

111.    As a result, on or about June 24, 2022, the case and investigation into Stephen Wallen was closed, and he was reinstated back to work from his suspension.

112.    On June 27, 2022, the LaFollette Police Department issued a Press Release regarding the investigation into Stephen Wallen, which stated, in relevant part:

> On June 24, 2022, notification was made back to LPD informing us that the investigation had been comp[l]eted and that Captain Wallen in his removal of the citation, acted in "good faith" by keeping an unnecessary citation from entering the court system. According to General Effler, Captain Wallen's action was not criminal in nature.
>
> It goes without saying, that misguided allegations can discredit an individual. However, in this situation, those individuals responsible for attempting to discredit a fine officer, underestimated the resolve of this department, its leadership and the fortitude of Captain Wallen. We at the City of LaFollette and the LaFollette Police Department are extremely proud to have Captain Steve Wallen return back to the ranks of LPD.

(Press Release, dated June 27, 2022, attached hereto as Exhibit 6).

113.    However, any and all complaints and/or communications of the Plaintiffs regarding the ticket fixing, as alleged herein, was done in good faith.

114.    The Press Release dated June 27, 2022 (at Exh. 6) was approved by agents and/or employees of the Defendant City of LaFollette, including Defendant Foust, before it was released.

115.    The Press Release dated June 27, 2022 (at Exh. 6) was approved by the Chief of Police, Bill Roehl, before it was released.

116.     The Press Release dated June 27, 2022 (at Exh. 6) was approved by Stephen Wallen before it was released.

117.     The Press Release dated June 27, 2022 (at Exh. 6) comment about "those individuals" who were allegedly "responsible for attempting to discredit a fine officer" is a clear reference to both of the Plaintiffs.

118.     As a result, both of the Plaintiffs continued to thereafter be ostracized and retaliated against due to the complaints of the ticket fixing and the TBI's investigation of Stephen Wallen and Wallen's suspension up through the date of their terminations, as hereinafter alleged, including by Chief of Police, Bill Roehl, and Wallen, who refused to even interact with Plaintiffs after Wallen's suspension, forward.

119.     On June 29, 2022, the attorney, Celeste Herbert, interviewed each Plaintiff separately in connection with her investigation.

120.     Prior to Plaintiffs' respective interviews with the attorney, Celeste Herbert, the Plaintiffs were never informed or made aware that they were under investigation for any reason.

121.     Prior to Plaintiff Tiller's interview with the attorney, Celeste Herbert, Defendant Foust falsely asserted to Tiller that Foust had "no idea" what the investigation was about.

122.     Prior to Plaintiff Tiller's interview with the attorney, Celeste Herbert, Defendant Foust told Tiller that the investigation was not about "one person," that Herbert was going to interview "each employee in the Police Department," and that the Defendant LaFollette City Council wanted this investigation.

123.     Prior to Plaintiff Tiller's interview with the attorney, Celeste Herbert, Tiller specifically asked Defendant Foust if he was allowed to have a lawyer with him during the interview, to which Foust stated that he could have one, but Foust further asserted "I don't know

why you would need a lawyer because if that'd be the case then everybody that has to go over there [to be interviewed] has to take a lawyer I guess" and Foust otherwise made it clear that the investigation was not about either of the Plaintiffs.

124.     At all times material hereto, Defendants' policies and procedures require City Administration, like Defendant Foust, to notify employees when they are under investigation.

125.     Shortly after Stephen Wallen returned from his suspension, in July 2022, Plaintiffs began hearing rumors from other police officers in the Department that Wallen was tracking Plaintiff Tiller's whereabouts, via a surveillance drone and also via a private GPS tracking device that had been installed on the bottom of Plaintiff Tiller's patrol vehicle.

126.     In fact, unbeknownst to Plaintiffs, the Defendant City of LaFollette purchased the GPS tracking device "GPS Tracker for Vehicle" on February 2, 2022, from Amazon.com for $335.99 using funds from the City's Drug Enforcement Fund. (*See* GPS Purchase Order and Related Documents, attached hereto as Exhibit 7).

127.     The GPS tracking device that Defendant City of LaFollette purchased from Amazon.com on February 2, 2022 (at Exh. 7), was installed on the bottom of Plaintiff Tiller's patrol vehicle.

128.     The GPS tracking device that Defendant City of LaFollette purchased from Amazon.com on February 2, 2022 (at Exh. 7), was installed on the bottom of Plaintiff Tiller's patrol vehicle without his knowledge or consent.

129.     The GPS tracking device that Defendant City of LaFollette purchased from Amazon.com on February 2, 2022 (at Exh. 7), was installed on the bottom of Plaintiff Tiller's patrol vehicle without a warrant.

130.     The GPS tracking device that Defendant City of LaFollette purchased from

Amazon.com on February 2, 2022 (at Exh. 7), allowed for locations to be tracked in real time.

131.     On or before February 2, 2022, Chief of Police, Bill Roehl, authorized the purchase of the GPS tracking device (at Exh. 7).

132.     On or before February 2, 2022, Stephen Wallen authorized the purchase of the GPS tracking device (at Exh. 7).

133.     Chief of Police, Bill Roehl, made the decision and/or was involved in the decision-making process to purchase the GPS tracking device (at Exh. 7) using funds from the Defendant City of LaFollette's Drug Enforcement Fund.

134.     Stephen Wallen made the decision and/or was involved in the decision-making process to purchase the GPS tracking device (at Exh. 7) using funds from the Defendant City of LaFollette's Drug Enforcement Fund.

135.     However, the GPS tracking device (referenced at Exh. 7) was not used for the Defendant City of LaFollette's Drug Enforcement purposes.

136.     Stephen Wallen made the decision and/or was involved in the decision-making process to attach the GPS tracking device (at Exh. 7) to the bottom of Plaintiff Tiller's patrol vehicle.

137.     The "Purchase Order" for the GPS tracking device lists the shipping address to the attention of Chief of Police, Bill Roehl, and further states: "Ordered For: Stephen Wallen." (Exh. 7).

138.     At all times material hereto, Defendants did not inform Plaintiff Tiller or make him aware that the GPS tracking device was attached to the bottom of Tiller's vehicle.

139.     At all times material hereto, Defendants did not obtain a search warrant to track Plaintiff Tiller's vehicle with the GPS tracking device.

140.     The GPS tracking device that Defendant City of LaFollette purchased from Amazon.com on February 2, 2022, using the Defendant City of LaFollette's Drug Enforcement Fund, was to be shipped to City employee, Katina Chapman. (*See* Exh. 7).

141.     At all times material hereto, the Defendant City of LaFollette's employee, Katrina Chapman, is the sister-in-law of Charles Duff.

142.     Thereafter, Defendants tracked the location of Plaintiff Tiller's vehicle for several months in 2022, including, specifically, whenever Plaintiff Tiller was at the house of Mike Evans.

143.     In response to Plaintiff Tiller's Open Records Act Request, Defendant City of LaFollette produced a document allegedly asserting the whereabouts of Plaintiff Tiller from March 8, 2022 through May 4, 2022, and attached thereto over 60 different GPS screenshots purporting to show Plaintiff Tiller's location for certain periods of time.

144.     In the GPS screenshots, Defendants annotated along the right side of each page the purported location of Plaintiff Tiller while he was allegedly on the clock, and, in several of these screenshots, Defendants annotated Tiller's location at "Mikes Evans House on the Clock" or words to that effect and, in other screenshots, Defendants also annotated when Tiller was at the home of City Councilman, Mark Hoskins, including "Left Mark Hoskins Went to Mike Evans on the Clock" and "Mark Hoskins on 5-4-22 on the Clock" with a note thereto which stated: "Proof that the City knew Brian [Tiller] was @ Mark Hoskins."

145.     Further, before Defendant City of LaFollette responded to Plaintiff Tiller's Open Records Act Request, an employee of the City, believed to be Defendant Foust, noted with respect to the GPS screenshots of Plaintiff Tiller's alleged location: "Police are allowed to go 1 mile outside city limits" and Foust also questioned, "Why was this issue never addressed? Why no corrective action?"

146. Prior to Plaintiff Tiller's termination, the Defendants never questioned, accused, or disciplined him for violating any policies with respect to his alleged location while on the clock.

147. On July 20, 2022, Plaintiff Tiller complained to the City Councilman, Mark Hoskins, that certain employees in the Police Department were spying on him by tracking his location via the GPS device and by use of a surveillance drone, including when Plaintiff Tiller was off-the-clock, such as whenever he was driving to, driving from, and/or was at his personal residence.

148. On July 20, 2022, Plaintiff Tiller also advised City Councilman, Mark Hoskins, that he had reported to an Agent of the Federal Bureau of Investigation ("FBI") that certain Defendants in the Department were spying on him by tracking his location via the GPS device and by use of a surveillance drone.

149. On July 27, 2022, Plaintiff Tiller sent a letter to Defendant Foust, copying several agents and/or employees of the Defendants thereto, including each member of Defendant LaFollette City Council, regarding Plaintiff Tiller's interest in applying for the Chief of Police position due to Bill Roehl's decision to retire on September 1, 2022. (Plaintiff Tiller's letter regarding Chief of Police position, dated July 27, 2022, attached hereto as Exhibit 8).

150. However, Defendants did not respond to Plaintiff Tiller's letter of July 27, 2022 (at Exh. 8), nor was Tiller ever questioned or interviewed in connection with his interest in the Chief of Police position.

151. Plaintiff Tiller was never questioned or interviewed about his interest in the Chief of Police position because by the time he sent his letter on July 27, 2022 (at Exh. 8), most, if not all, of the Defendants' agents and/or employees had engaged in discussions and made the decision that Plaintiff Tiller, as well as Plaintiff Miller, would be fired.

152.     Discussing and making the decision to terminate employees, like Plaintiffs, outside the purview of the public eye, such as with elected members of Defendant LaFollette City Council would be a violation of the Tennessee Sunshine laws, Tenn. Code Ann. § 8-44-101, *et seq*.

153.     The outside counsel, attorney Celeste Herbert, retained to conduct the investigation into Charles Duff's grievance of June 13, 2022, concluded her investigation on August 2, 2022.

154.     Ultimately, the attorney, Celeste Herbert, was paid by the Defendant City of LaFollette from June 14, 2022 to August 2, 2022 to perform her investigation into Charles Duff's grievance.

155.     During the time that the attorney, Celeste Herbert, was retained by Defendant City of LaFollette, the extent of Herbert's investigation consisted of interviewing certain employees of the Police Department, which were recorded and documented with her annotations.

156.     At the conclusion of the investigation, the attorney, Celeste Herbert, sent a 2.5-page letter ("Herbert's letter") on August 2, 2022, to the Defendants, City of LaFollette and City Council, among others, regarding her investigation into Charles Duff's grievance.

157.     In fact, the attorney, Celeste Herbert's letter was allegedly provided to the members of the Defendant, LaFollette City Council—for the first time ever—only about two hours prior to the City Council meeting on August 2, 2022.

158.     With respect to Plaintiff Miller, the attorney, Celeste Herbert's letter stated, in part, that the "City Administrator has the authority to make a final decision after reviewing investigation results," that an employee "may be subject to immediate discipline ranging from a written warning to discharge, depending on the severity of the violation," and then Herbert opined that Plaintiff Miller's alleged conduct was "severe." However, Herbert's conclusions were slanted by false information provided to her by certain agents and/or employees of Defendants, including but not

limited to, Defendant Foust, Stephen Wallen, Charles Duff, among others, who were retaliating against Plaintiffs due to their belief that Plaintiffs supported other political candidates and also reported the ticket fixing described above that caused Wallen's suspension pending the TBI's investigation.

159. The attorney, Celeste Herbert's letter did not specifically recommend that Plaintiff Miller be terminated.

160. With respect to Plaintiff Tiller, the attorney, Celeste Herbert's letter stated the following:

> I could not corroborate that Lt. Tiller directly engaged in such conduct [related to the harassing and/or bullying]; however, Lt. Tiller is the direct supervisor of Sgt. Miller. Lt. Tiller has failed to address the conduct of Sgt. Miller. Due to this failure, Sgt. Miller has expanded his targets of bullying and harassment to other members of the department. Given the open and notorious nature of Sgt. Miller's conduct, Lt. Tiller either agreed with Sgt. Miller's behavior or purposely ignored it. Disciplinary action for Lt. Tiller's failure to properly supervise Sgt. Miller is also recommended by this investigator.

161. The "conduct" that the attorney, Celeste Herbert, stated in her letter that she "could not corroborate" Plaintiff Tiller had engaged in, *i.e.*, the harassing and/or bullying remarks, were impacted by the false reports of certain agents and/or employees of Defendants, including but not limited to, Defendant Foust, Stephen Wallen, Charles Duff, among others, who were retaliating against the Plaintiffs.

162. The attorney, Celeste Herbert's letter never recommended that Plaintiff Tiller be terminated.

163. However, the Defendant LaFollette City Council disregarded the attorney, Celeste Herbert's letter recommending that Plaintiff Tiller only be disciplined.

164. Instead, the Defendant LaFollette City Council opted for the harshest available punishment which was the termination of Plaintiff Tiller's employment.

165.     During the Defendant LaFollette City Council's meeting on August 2, 2022, which was open to the public, the City Council voluntarily discussed both Charles Duff's grievance dated June 13, 2022, and the attorney, Celeste Herbert's subsequent letter dated August 2, 2022.

166.     Leading up to the August 2, 2022 meeting, the two frontrunners for the Chief of Police position were Stephen Wallen and Plaintiff Tiller.

167.     Prior to the August 2, 2022 meeting, however, the decision had already been made to promote Stephen Wallen to the Chief of Police position and to terminate both of the Plaintiffs.

168.     In fact, in July 2022, shortly after Stephen Wallen returned from his suspension, Plaintiff Tiller was told by City Councilman, Mark Hoskins, that Tiller was going to be fired and that this decision "came to him through the [City] Council."

169.     During the public hearing on August 2, 2022, the Defendant LaFollette City Council voted to appoint Stephen Wallen into the Chief of Police position, which was then followed by a motion to "suspend the rules" regarding the attorney, Celeste Herbert's letter into Charles Duff's grievance, and, at that time, the City Council voted to terminate both of the Plaintiffs while the rules were suspended. (LaFollette City Council Meeting Minutes, dated August 2, 2022, attached hereto as Exhibit 9).

170.     For years prior, whenever the issue of whether a police officer of the Defendant City of LaFollette should be terminated by the vote of the Defendant LaFollette City Council, the Chief of Police would initially make a recommendation to the City Administrator, and, if there is agreement on the recommendation, then the City Administrator would thereafter provide a recommendation to the City Council, and then, at that time, the City Council would make the decision by way of vote. Throughout this process, the employee recommended for termination was given proper notice in order to prepare a response and also request a hearing.

171. However, the above-referenced procedures were not followed with respect to the terminations of the Plaintiffs on August 2, 2022. (*See* Exh. 9).

172. In fact, the Plaintiffs were never even aware that their employments were in jeopardy prior to August 2, 2022, other than mere rumors outside the purview of the public eye and in violation of the Tennessee Sunshine laws, Tenn. Code Ann. § 8-44-101, *et seq*.

173. Thus, on August 2, 2022, the Defendant LaFollette City Council unlawfully terminated both Plaintiffs, Miller and Tiller, after only allegedly reviewing the attorney, Celeste Herbert's unsubstantiated cursory 2.5-page letter, in direct violation of rights and property interests established by the Defendant City of LaFollette's Personnel Policy. (*See* City Council Meeting Minutes, dated August 2, 2022, at Exh. 9).

174. Prior to allegedly relying on the attorney, Celeste Herbert's letter and Charles Duff's grievance to terminate Plaintiffs on August 2, 2022, the Defendants never gave the Plaintiffs the opportunity to respond to the allegations in Herbert's letter, or independently ascertained the truth, and, thereafter, shredded the investigative materials, as hereinafter alleged.

175. As a result, when voting to terminate the Plaintiffs, the Defendant LaFollette City Council acted in reckless disregard of the truth.

176. In terminating the Plaintiffs on August 2, 2022, the Defendants City of LaFollette, via the City Council, were acting under color of the law pursuant to their respective governmental duties and powers, and there was no further appeal of the termination decisions.

177. Defendants City of LaFollette, via the City Council, acted pursuant to their official policies in that they had the final policy-making authority with respect to Plaintiffs' terminations.

178. Defendants City of LaFollette, via the City Council's decision to terminate the Plaintiffs was unreviewable.

179.     With respect to the investigative material created by and/or allegedly relied on by the attorney, Celeste Herbert, in connection to her investigation, said investigative material was destroyed by Herbert at the instruction of Defendant Foust, including all notes and recordings related thereto.

180.     As of the date of this filing, given the instructions of Defendant Foust, there is no documentation as to the substance of the interviews taken by Celeste Herbert, or what was said during those interviews.

181.     The attorney, Celeste Herbert, interviewed the same agents and/or employees that Charles Duff, among others, relied on to formulate the false allegations against the Plaintiffs in Duff's grievance in further retaliation against the Plaintiffs.

182.     Given Defendant Foust's instructions to attorney, Celeste Herbert, to destroy the investigative notes and recordings, Plaintiffs have been deprived of the ability to know the misrepresentations that were made to Herbert, so that the Plaintiffs could defend themselves from the retaliatory conduct described herein. (Foust-Herbert Emails dated August 3, 2022, attached hereto as Exhibit 10).

183.     In addition, the attorney, Celeste Herbert's conclusory letter dated August 2, 2022, does not contain, describe, or summarize any of Herbert's notes, recordings, or any other investigative material illustrating the credibility of or the method to which she reached her overall conclusions and recommendations and the false allegations fed to her by certain agents and/or employees of Defendants, including but not limited to, Defendant Foust, Stephen Wallen, Charles Duff, among others.

184.     The documents and recordings in the above-referenced Paragraph were created by an agent of the Defendant City of LaFollette and, therefore, are "public records" as defined by the

Tennessee Public Records Act.

185.    Nonetheless, any evidence that could have substantiated the attorney, Celeste Herbert's conclusory letter and, thus, the underlying evidence of the alleged bullying and/or harassment of Plaintiff Miller was destroyed post-investigation, as Herbert confirmed the destruction of the notes and the recordings during her testimony on October 17, 2022.

186.    Initially, Defendant Foust testified under oath on September 14, 2022 that he had nothing to do with the destruction of the investigative material, other than he was informed by the attorney, Celeste Herbert, that her normal practice was to destroy the material once she had completed her investigation.

187.    On October 17, 2022, the attorney, Celeste Herbert, testified under oath that she did not recall ever doing a previous investigation for Defendant City of LaFollette, and that she had no indication that these documents would be subject to the Tennessee Public Records Act.

188.    It was later determined that the authorization to destroy the investigation material was issued by Defendant Foust in emails between Foust and Herbert on August 3, 2022 that were recovered by the Defendant City of LaFollette's IT Department—emails that were recovered in Defendant Foust's "Deleted Items" folder—following the testimony of Foust on September 14, 2022. (Foust-Herbert Emails dated August 3, 2022, at Exh. 10).

189.    After the discovery of the emails, Defendant Foust testified again on October 17, 2022, confirming that he sent the emails to the attorney, Celeste Herbert, related to the shredding of the investigative materials.

190.    In fact, on October 17, 2022, Defendant Foust testified that he authorized the attorney, Celeste Herbert, to destroy her investigation materials. (*See* Exh. 10).

191.    Defendants intended to cover up the retaliatory nature of Charles Duff's grievance,

as well as the false information provided to the investigator, by having the notes and recordings destroyed after Herbert's letter was written.

192.    During his testimony on October 17, 2022, Defendant Foust also testified that the Defendant City of LaFollette's record retention policy for such documents was one year.

193.    Therefore, this was in violation of the Defendant City of LaFollette's record retention policy and the Tennessee Public Records Act.

194.    On August 5, 2022, Defendant City of LaFollette was sent a Notice of Preservation of Evidence by Plaintiff Miller's attorney, via fax and email. (Notice of Preservation of Evidence, dated August 5, 2022, attached hereto as Exhibit 11).

195.    Defendant City of LaFollette received the Notice of Preservation of Evidence via fax at 3:30 PM EST on August 5, 2022. (*See* Exh. 11).

196.    Defendant City of LaFollette's City Attorney, Reid Troutman, acknowledged receipt of the Notice of Preservation of Evidence via email at 3:43 PM EST on August 5, 2022. (*See* Exh. 11).

197.    At all times material hereto, the Defendant City of LaFollette's City Attorney, Reid Troutman, was an agent and/or employee of the Defendants.

198.    Defendants received the Notice of Preservation of Evidence on August 5, 2022. (*See* Exh. 11).

199.    Despite testifying on September 14, 2022, that Defendant Foust received the Notice of Preservation of Evidence request on August 8, 2022, Defendant Foust never provided the preservation request via email (at Exh. 11) to either the attorney, Celeste Herbert, or to any other official of Defendant City of LaFollette.

200.    On October 17, 2022, attorney, Celeste Herbert, testified she would have retained

her investigative materials if Defendant Foust had provided her the Notice of Preservation of Evidence request, which was sent on August 5, 2022 (at Exh. 11) and allegedly received by Defendant Foust until August 8, 2022.

201.    As a result, Defendant Foust's conduct resulted in the intentional destruction of any and all investigative material and recordings that were created by and/or relied on by the attorney, Celeste Herbert, in connection with her investigation.

202.    Prior to his termination, Plaintiff Miller was never provided any notice by Defendants, including Defendant Foust, or by Bill Roehl, Stephen Wallen, Charles Duff, or anyone else, that the attorney, Celeste Herbert's letter recommended disciplinary action and/or termination.

203.    Further, prior to Plaintiff Miller's termination, his direct supervisor, Charles Duff, had never attempted to progressively discipline Plaintiff Miller.

204.    Prior to his termination, Plaintiff Tiller was never provided any notice by Defendants, including Defendant Foust, or by Bill Roehl, Stephen Wallen, Charles Duff, or anyone else, that the attorney, Celeste Herbert's letter recommended disciplinary action and/or termination.

205.    Further, as to the rationale for recommending that Plaintiff Tiller only be disciplined in the attorney, Celeste Herbert's letter dated August 2, 2022—which was based on false information that was provided in retaliation against the Plaintiffs—Herbert stated that Tiller was the "direct supervisor of Sgt. Miller," that Plaintiff Tiller "failed to address the conduct of Sgt. Miller," and, due to the "open and notorious nature of Sgt. Miller's conduct, Lt. Tiller either agreed with Sgt. Miller's behavior or purposely ignored it" and, as a result, Tiller should be disciplined for "failure to properly supervise" Miller.

206.    However, at all times material hereto, Lt. James Lynch was a direct supervisor of Charles Duff, and, in turn, Lt. Lynch would have also been considered a supervisor over Plaintiff Miller's chain-of-command.

207.    Therefore, Lt. James Lynch was considered to be a "direct supervisor" of Charles Duff and Plaintiff Miller for the same reason that the attorney, Celeste Herbert's letter considered Plaintiff Tiller to be a "direct supervisor" of Plaintiff Miller.

208.    However, Lt. James Lynch was never blamed or faulted for Plaintiff Miller's alleged harassment of Charles Duff, nor for failing to properly supervise Plaintiff Miller.

209.    At all times material hereto, Lt. James Lynch had the authority in his supervisory role to direct and control certain aspects of the employment of Plaintiff Miller and Charles Duff, such as recommending disciplinary action.

210.    At all times material hereto, Lt. James Lynch was never disciplined or terminated for Plaintiff Miller's alleged harassment of Charles Duff.

211.    At all times material hereto, Lt. James Lynch was never disciplined or terminated for failing to properly supervise Plaintiff Miller.

212.    From January 2022 through August 2, 2022, Charles Duff's commissioned rank within the LaFollette Police Department was a "Staff Sergeant."

213.    From January 2022 through August 2, 2022, Plaintiff Miller's commissioned rank within the LaFollette Police Department was a "Sergeant."

214.    According to the Defendant City of LaFollette Police Department's policies, at all times material hereto, a "Staff Sergeant" is a higher commissioned rank than a "Sergeant."

215.    Therefore, from January 2022 through August 2, 2022, Charles Duff was considered to be a higher rank and supervisor of Plaintiff Miller.

216.     However, Charles Duff never previously complained about, or took any action to address, Plaintiff Miller's alleged bullying and/or harassment, that is, until Duff filed his retaliatory grievance on June 13, 2022.

217.     Prior to his termination, Plaintiff Miller was never provided any notice that his discipline and/or termination was to be discussed by Defendant LaFollette City Council on August 2, 2022.

218.     Prior to his termination, Plaintiff Tiller was never provided any notice that his discipline and/or termination was to be discussed by Defendant LaFollette City Council on August 2, 2022.

219.     Prior to Plaintiff Miller's termination, Defendant Foust, as well as Bill Roehl, Stephen Wallen, and Charles Duff, never provided Plaintiff Miller the reasons for his termination or notified him of any alleged performance issues.

220.     Prior to Plaintiff Tiller's termination, Defendant Foust, as well as Bill Roehl, Stephen Wallen, and Charles Duff, never provided Plaintiff Tiller the reasons for his termination or notified him of any alleged performance issues.

221.     Plaintiff Miller was never provided a hearing and/or opportunity to clear his name—despite requesting such a hearing on August 24, 2022. (Plaintiff Miller's Request for Hearing, attached hereto as Exhibit 12).

222.     Defendants received Plaintiff Miller's request for a hearing on August 24, 2022. (*See* Exh. 12).

223.     Defendants never responded to Plaintiff Miller's request for a hearing dated August 24, 2022. (*See* Exh. 12).

224.     Plaintiff Tiller was never provided a hearing and/or opportunity to clear his name.

225. It would have been futile for Plaintiff Tiller to request such a name clearing hearing, especially since Defendants ignored Plaintiff Miller's request for such a hearing on August 24, 2022. (*See* Exh. 12).

226. Defendants City of LaFollette and/or LaFollette City Council never provided Plaintiffs with a name clearing hearing following their terminations on August 2, 2022.

227. As of the date of this filing, Plaintiff Miller has never been provided documentation regarding his termination or a hearing.

228. As of the date of this filing, Plaintiff Tiller has never been provided documentation regarding his termination or a hearing.

229. Both Plaintiffs have also been denied their right to appeal their respective terminations.

230. At all times material hereto, including before his termination, Plaintiff Miller was never "furnished an advance written notice containing the nature of the proposed action, the reasons therefore, and the right to appeal the charges orally or in writing before the City Administrator" as provided in the City's Personnel Policy under Section K - Dismissal. (Exh. 1).

231. At all times material hereto, including before his termination, Plaintiff Tiller was never "furnished an advance written notice containing the nature of the proposed action, the reasons therefore, and the right to appeal the charges orally or in writing before the City Administrator" as provided in the City's Personnel Policy under Section K - Dismissal. (Exh. 1).

232. As a result, both Plaintiffs' terminations were further in violation of Defendant City of LaFollette's Personnel Policy, Section K – Dismissal. (*See* Exh. 1).

233. At all times material hereto, the Defendant City of LaFollette's Personnel Policy further asserts that employees will not be terminated for reasons that violate State or Federal law.

234.     Prior to their terminations, both Plaintiffs were accused of trying to "set Wallen up" with respect to the TBI investigation in June 2022, including by the Chief of Police, Bill Roehl.

235.     After the Plaintiffs' terminations, Stephen Wallen told another police officer that the Plaintiffs were fired because they "messed with my [Wallen's] family" with respect to the TBI investigation in June 2022.

236.     After the Plaintiffs' terminations were secured, Defendants rewarded those who helped make the terminations possible, *i.e.*, by providing the following employees with *quid pro quo* promotions.

237.     Immediately before the Plaintiffs were terminated during Defendant LaFollette City Council's meeting on August 2, 2022, Stephen Wallen was promoted to the Chief of Police position and Wallen also received a pay increase for this promotion. (*See* City Council August 2, 2022 Meeting Minutes, at Exh. 9).

238.     On September 6, 2022, Defendant LaFollette City Council approved the promotion of Homer Herrell to a full-time Lieutenant, and Herrell also received a pay increase for this promotion effective September 10, 2022.

239.     Previously, in Charles Duff's grievance dated June 13, 2022, Duff stated, in relevant part: "If you think the Police Department is a mess try looking into this matter first. Start with the officers talk to them Sgt. Homer Herrell has a lot of information on this stating the guys are in the same situation, with Monty [Miller] and Tiller trying to divide the department what do they need to do? If they don't get on their side what will happen if the [Lafollette City] council does change and Tiller goes in as Chief will they have a job or not."

240.     Thereafter, Sgt. Homer Herrell was "interviewed" during the investigation by the attorney, Celeste Herbert, and Herrell provided information regarding the Plaintiffs.

241.     On October 4, 2022, Defendant LaFollette City Council approved the promotion of Charles Duff to a full-time Captain, and Duff also received a pay increase for this promotion effective October 8, 2022.

242.     On October 4, 2022, Defendant LaFollette City Council approved the promotion of Matthew Forsyth to a full-time Lieutenant, and Forsyth also received a pay increase for this promotion effective October 8, 2022.

243.     In fact, on or before October 4, 2022, Defendants City of LaFollette and/or LaFollette City Council actually created a third Lieutenant position specifically to promote Matthew Forsyth into the role.

244.     At all times material hereto, Matthew Forsyth was friends with Stephen Wallen.

245.     At all times material hereto, Matthew Forsyth was the nephew of City Councilman, Wayne Kitts.

246.     Previously, during the time that Matthew Forsyth was a Detective Sergeant, Forsyth's responsibilities included installing GPS tracking devices to the vehicles of suspects, and Forsyth also used a drone to conduct surveillance.

247.     On information and belief, Matthew Forsyth was involved in and/or had knowledge of the GPS device and surveillance drone that were used to track Plaintiff Tiller in 2022.

248.     If proper due process had been provided, the allegations against Plaintiffs would have been proven false or, at the very least, seriously exaggerated and retaliatory.

249.     Plaintiffs' terminations were unlawful adverse actions, subjecting them to retaliation and depriving them of their right to free speech, employment, reputation, and constitutional right to be heard.

250.     At all times material hereto, the Plaintiffs had a constitutionally protected property

interest in continued employment, and also a constitutionally protected liberty interest in their respective reputation, good name, honor, and integrity, and the right to free speech, all of which could not be deprived of these rights without due process.

251.     Defendants' conduct deprived Plaintiffs of their respective rights to due process, rights to free speech, and liberty, pursuant to a governmental custom, policy, ordinance, regulation, and/or decision and while acting under color of law, including by prohibiting Plaintiffs from being able to respond to the allegations and prohibiting them from telling their side of the story.

252.     In terminating the Plaintiffs, Defendants acted under color of the law pursuant to their governmental duties and powers.

253.     Defendants controlled the terms and conditions of Plaintiffs' employments, had the authority to discharge Plaintiffs and/or influence their discharge, made the decision to discharge them, and acted as the final decision-maker.

254.     As the Defendants acted pursuant to official policies and customs, had final policy-making authority, and Defendants abused their authority under color of law while purporting to act pursuant to their official duties in subjecting Plaintiffs to unlawful conduct, and depriving them of their rights to due process.

255.     Defendants knew or should have reasonably known that Defendants engaged in acts that deprived Plaintiffs of their free speech, liberty, and rights to due process and failed to act to prevent it, or correct the violations of their constitutional rights.

256.     Defendants City of LaFollette and LaFollette City Council are responsible and liable for the retaliatory actions of its agents and employees under the doctrine of *respondent superior* and under agency principles, and further, Defendants City of LaFollette and LaFollette

City Council are responsible and liable because the decision-maker(s) to Plaintiffs' terminations had final policy-making authority with respect to the termination decisions.

257.     A person's reputation, good name, honor, integrity, and free speech are among the liberty interests protected by the due process clause of the Fourteenth Amendment.

258.     The actions of Defendants' agents and employees, as alleged herein, were arbitrary and capricious.

259.     Defendants' abuse of power, as alleged herein, was brutal and offensive and does not comport with traditional ideas of fair play and decency.

260.     Defendants' conduct as alleged herein was part of an official government policy, custom, practice, or regulation of Defendants City of LaFollette and/or LaFollette City Council.

261.     This suit is timely filed.

262.     As a result of Defendants' conduct, the Plaintiffs have sustained, and will sustain, great humiliation, embarrassment, emotional distress and anxiety, damage to their professional reputations and standing in the community, and loss of enjoyment of life, and Plaintiffs have further lost tangible job benefits, including a loss of income and other privileges and benefits of employment, both past and future.

## COUNT I
*Violation of Civil Rights under Color of Law, 42 U.S.C. § 1983,*
*under the First and Fourteenth Amendments of the United States Constitution*

### Retaliation for Protected Speech

263.     The foregoing allegations are incorporated herein by reference to same.

264.     The First Amendment protects a public employee's right to engage in protected conduct and speak on matters of public concern, which encompasses any political or social matter or other concern to the community.

265.     Here, the Defendants' termination of Plaintiffs allegedly due to the attorney, Celeste Herbert's unsubstantiated, cursory letter, which is seemingly based only on Charles Duff's retaliatory grievance, as alleged above, accuses Plaintiffs of conduct that is actually protected by the First Amendment, including but not limited to, (a) by supporting certain political candidates including those who could potentially appoint and/or support Plaintiff Tiller as the next Chief of Police if successful in their candidacies, and (b) by reporting Stephen Wallen's illegal, criminal, and unethical act.

266.     Political speech and reporting criminal conduct, however, are both protected speech under the First Amendment.

267.     Further, Plaintiffs' free speech interests outweigh the efficiency interests of the City as employer because their statements did not impair discipline by superiors or harmony among co-workers, detrimentally impact close working relationships, nor impede the performance of Plaintiffs' duties or interfere with the Department's normal operations. Any conclusion by the Defendants to the contrary is solely based on Charles Duff's unsubstantiated retaliatory grievance.

268.     Thus, the Defendants' termination of Plaintiffs was, at a minimum, because of and motivated by Plaintiffs' exercise of protected speech, which chills any ordinary person in the exercise of their First Amendment rights.

269.     As a result, the Defendants' termination of Plaintiffs is retaliatory in clear violation of 42 U.S.C. § 1983, and the First and Fourteenth Amendment of the United States Constitution, which is designed to protect and preserve an employee's interest in speaking freely.

270.     As set forth herein, Defendants deprived Plaintiffs of the rights secured by the United States Constitution while acting under color of law.

271.     Defendants' conduct was undertaken with malice and/or reckless indifference for

or indifference to Plaintiffs' federally protected rights.

272.  As set forth above, Defendants' conduct harmed and caused damages to Plaintiffs, as alleged herein.

## COUNT II

*Violation of Civil Rights under Color of Law, 42 U.S.C. § 1983,*
*under the First and Fourteenth Amendments of the United States Constitution*

### Retaliation for Political Association

273.  The foregoing allegations are incorporated herein by reference to same.

274.  Political association, affiliation, and/or patronage is a well-established right protected by the First Amendment of the United States Constitution.

275.  Here, the Defendants' terminations of Plaintiffs allegedly due to attorney, Celeste Herbert's unsubstantiated, cursory letter and/or Charles Duff's grievance, which accused Plaintiffs of expressing support for and/or associating with certain political candidates who, if successful, could potentially appoint and/or support Plaintiff Tiller as the next Chief of Police, and this included tracking the location of Tiller when he associated with current members and/or candidates of LaFollette City Council, as Tiller had openly supported and affiliated with such members and/or candidates leading up to his termination, and, in fact, at least one of those candidates for City Counsel was running against some of the same City Council incumbents who ultimately voted to summarily terminate the Plaintiffs.

276.  Association, affiliation, and support of political candidates and/or elected officials, however, are protected conduct under the First Amendment of the United States Constitution.

277.  Further, the Plaintiffs, as police officers, were not in a position for which political party affiliation and/or patronage is an appropriate consideration.

278.  Thus, the Defendants' termination of Plaintiffs was because of Plaintiffs' protected

conduct of political association, affiliation and/or patronage.

279.   As a result, the Defendants' termination of Plaintiffs is retaliatory in clear violation of 42 U.S.C. § 1983, and the First and Fourteenth Amendment of the United States Constitution, which is designed to protect and preserve an employee's right to political belief and association, which are core activities under the First Amendment.

280.   As set forth herein, Defendants deprived Plaintiffs of the rights secured by the United States Constitution while acting under color of law.

281.   Defendants' conduct was undertaken with malice and/or reckless indifference for or indifference to Plaintiffs' federally protected rights.

282.   As set forth above, Defendants' conduct harmed and caused damages to Plaintiffs, as alleged herein.

## COUNT III
*Violation of Civil Rights under Color of Law, 42 U.S.C. § 1983,*
*under the Fourteenth Amendment of the United States Constitution*

## Deprivation of Due Process

283.   The foregoing allegations are incorporated herein by reference to same.

284.   The Fourteenth Amendment guarantees that no person shall be deprived of life, liberty, or property without due process of law.

285.   Plaintiffs, as full-time employees, with fully vested property interests based upon policy and practice of the Defendant City of LaFollette were denied such guarantee when the Defendants terminated their employments without prior notice and without prior opportunity to challenge the allegations against them.

286.   In addition, still, to this day, the Defendants have also failed to provide Plaintiffs with documentation of their terminations, a name-clearing hearing, or an opportunity to appeal

their terminations.

287.   As a result, the Defendants have not only violated their own personnel policies, which mandate that advance notice and a right to appeal be issued to an employee terminated for just cause, but the Defendants have also violated the Fourteenth Amendment.

## COUNT IV
*Violation of Civil Rights under Color of Law, 42 U.S.C. § 1983,*
*under the Fourteenth Amendment of the United States Constitution*

### Deprivation of Reputation

288.   The foregoing allegations are incorporated herein by reference to same.

289.   The Fourteenth Amendment secures an individual's right to due process when an employer deprives an employee of his protected liberty interest in his good name, reputation, honor, or integrity.

290.   Here, the Defendants deprived Plaintiffs of their good name and reputation when it terminated Plaintiffs' employments based on defamatory, unsubstantiated allegations—which are far more serious than mere allegations of improper or inadequate performance, incompetence, or neglect of duty or malfeasance.

291.   The defamatory and unsubstantiated allegations against Plaintiffs were voluntarily discussed by the Defendant LaFollette City Council during its August 2, 2022 meeting.

292.   Plaintiffs have forever been denied the opportunity to clear their names, particularly since Defendant Foust illegally authorized the destruction of the underlying investigation including notes and recordings by Herbert.

293.   If proper due process had been provided, then the allegations against Plaintiffs would have been proven false or, at the very least, seriously exaggerated and retaliatory. Accordingly, Plaintiff Miller requested a name-clearing hearing on August 24, 2022, which the

Defendants blatantly ignored, and, therefore, any such request for same by Plaintiff Tiller would have been futile.

294.    However, still to this day, the Defendants have never provided Plaintiffs an opportunity to clear their names or contest Charles Duff's grievance and/or Herbert's letter that is founded on Duff's retaliatory allegations of harassment.

295.    Consequently, Defendants have violated, and continue to violate, the right of Plaintiffs to their good name, reputation, honor, and integrity under the Fourteenth Amendment.

296.    Defendants' conduct shocks the conscious, the deprivation of Plaintiffs' rights and interests was a result of egregious abuses of government power by Defendants sufficient to cause violations of Plaintiffs' First and Fourteenth Amendment Rights, and the conduct of Defendants were arbitrary and capricious, and harmed and caused damages to Plaintiffs, as alleged herein.

## COUNT V
*Tennessee Public Protection Act,*
*Tennessee Code Annotated § 50–1–304, for Retaliatory Discharge*

297.    The foregoing allegations are incorporated herein by reference to same.

298.    Here, Plaintiffs were retaliated against and ultimately terminated after an unsubstantiated complaint accused Plaintiffs of refusing to remain silent about illegal activities— Stephen Wallen exceeding his position, power and authority by tampering with and/or removing material government evidence, before it can be processed into the judicial system, as a favor for a private citizen who Wallen described as someone he had "known from childhood" and then illegally tracking the location of Plaintiff Tiller via the GPS and surveillance drone—which was reported to, and/or investigated by, the Tennessee Bureau of Investigation and/or the Federal Bureau of Investigation.

299.    Defendants, City of LaFollette and LaFollette City Council's termination of

Plaintiffs constitutes a violation of public policy and the Tennessee Public Protection Act, Tenn. Code Ann. § 50-1-304, because no employee can be discharged or terminated for refusing to participate in, or for refusing to remain silent about illegal activities.

300. As a result, Plaintiffs were terminated in direct contravention of the Tennessee Whistleblower Act, which was designed to protect employees in situations such as this one.

301. Defendants, City of LaFollette and LaFollette City Council's conduct was intentional, reckless, malicious, and/or fraudulent.

302. As set forth above, Defendants City of LaFollette and LaFollette City Council's harmed and caused damages to Plaintiffs as alleged herein.

**COUNT VI**
*Tennessee Public Employee Political Freedom Act*
*Tennessee Code Annotated § 8-50-603*

303. The foregoing allegations are incorporated herein by reference to same.

304. As set forth above, Plaintiffs reported and/or were accused of reporting the illegal and unethical conduct that they reasonably believed violated the laws, regulations, codes and ordinances intended to protect the public health, safety, and welfare, to elected public officials, including Defendant LaFollette City Council members, and, thereafter, Plaintiffs were investigated and terminated for trumped-up reasons.

305. As an additional cause of action and/or in the alternative to the other claims set forth herein, Plaintiffs were wrongfully terminated and otherwise discriminated against for exercising their rights to communicate with elected public official(s) in violation of the Tennessee Public Employee Political Freedom Act, Tenn. Code Ann. § 8-50-603.

306. Therefore, Plaintiffs are entitled to the following relief provided by the anti-discrimination/retaliation provision of the Tennessee Public Employee Political Freedom Act,

Tenn. Code Ann. § 8-50-603, including treble damages, plus reasonable attorneys' fees.

307.  As set forth above, Defendants City of LaFollette and LaFollette City Council's conduct harmed and caused damages to Plaintiffs as alleged herein.

## JURY DEMAND

308.  Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury for all triable claims asserted in this Complaint.

## PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiffs respectfully pray for the following relief:

1.  Compensatory damages, including back pay and front pay (or, in the alternative, reinstatement, if the Court deems it appropriate).

2.  Treble damages.

3.  Appropriate punitive damages.

4.  Prejudgment interest.

5.  Reasonable attorney's fees.

6.  The costs of this action.

7.  A jury to try this cause.

8.  Appropriate injunctive relief ordering Defendants to cease and desist from engaging in retaliatory acts, illegal and unethical conduct as public officials, and to undergo training as appropriate.

RESPECTFULLY SUBMITTED, this the 3rd day of May, 2023.

**THE BURKHALTER LAW FIRM, P.C.**


s/D. Alexander Burkhalter, III
David A. Burkhalter II, TN BPR #004771
D. Alexander Burkhalter, III, TN BPR #033642

Zachary J. Burkhalter, TN BPR #035956
P.O. Box 2777
Knoxville, Tennessee, 37901
(865) 524-4974

**STURGILL, TURNER, BARKER & MOLONEY, PLLC**

BY: *_/s/ L. Scott Miller_*
L. Scott Miller (TN Bar# 034102)
333 West Vine Street, Suite 1500
Lexington, Kentucky 40507
415 West Central Avenue, Suite 1
LaFollette, Tennessee 37766-3463
T: 859.255.858
E: smiller@sturgillturner.com

**COUNSEL FOR PLAINTIFFS**